juvenile's mental health needs. I would agree that if the State presents evidence that a parent is not properly dealing with a child's mental health issues, a court could order the parent to comply with suitable therapy and require followup reports. But an order to release past mental health records so that the State can assess them is substantially different from requiring a parent to obtain mental health or substance abuse treatment or to participate in family therapy. This court has not previously addressed the privacy concerns raised by an order like this and need not do so now. But I believe an advisory opinion that such orders are within a juvenile court's discretion is inappropriate.

---

BRUCE SIMON, APPELLANT, V. MARY KAY
DRAKE, M.D., APPELLEE.
___ N.W.2d ___

Filed May 3, 2013.    No. S-11-744.

1. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.
2. **Trial: Evidence: Appeal and Error.** In a civil case, the admission or exclusion of evidence is not reversible error unless it unfairly prejudiced a substantial right of the complaining party.
3. **Expert Witnesses: Testimony: Appeal and Error.** An appellate court reviews a trial court's decision to admit or exclude expert testimony under the appropriate standards for abuse of discretion.
4. **Rules of Evidence: Expert Witnesses: Testimony.** Under Neb. Evid. R. 702, Neb. Rev. Stat. § 27-702 (Reissue 2008), a trial court does not have discretion to permit a witness who has not been qualified as an expert to testify to issues that require an expert's opinion.
5. **Malpractice: Physicians and Surgeons: Proximate Cause.** In medical malpractice cases, expert testimony by a medical professional is normally required to establish causation and the standard of care under the circumstances.

Petition for further review from the Court of Appeals, INBODY, Chief Judge, and IRWIN and SIEVERS, Judges, on appeal thereto from the District Court for Douglas County, GARY B.

Randall, Judge. Judgment of Court of Appeals reversed, and cause remanded with directions.

Robert M. Slovek and Douglas W. Peters, of Kutak Rock, L.L.P., for appellant.

Joseph S. Daly and Mary M. Schott, of Sodoro, Daly & Sodoro, P.C., for appellee.

Heavican, C.J., Connolly, and McCormack, JJ., and Riedmann, Judge, and Cheuvront, District Judge, Retired.

Connolly, J.

## SUMMARY

The appellant, Bruce Simon, sued the appellee, Mary Kay Drake, M.D., for medical malpractice. A jury returned a verdict for Drake. Simon appeals from the district court's evidentiary rulings. During trial, the court permitted Drake to question one of Simon's treating physicians, Kevin Garvin, about his opinion of Drake's performance in treating Simon for hip pain—even though neither party had designated Garvin as an expert.

In a memorandum opinion, the Nebraska Court of Appeals concluded that the trial court erroneously admitted Garvin's testimony about the standard of care. But it concluded that the error was not prejudicial because the parties' designated experts provided similar evidence. We granted Simon's petition for further review of the Court of Appeals' conclusion that Simon was not prejudiced by the trial court's erroneous admission of Garvin's testimony. We reverse. The court's ruling denied Simon any opportunity to challenge the presumptive validity and weight that a jury would have given to Simon's own treating physician testifying as an expert against him.

## BACKGROUND

### Historical Facts

In 2006, Simon's primary care physician began treating Simon for back and hip pain. In June 2007, Simon first saw Garvin, an orthopedic surgeon at the University of Nebraska

Medical Center (UNMC). Garvin ordered x rays that showed Simon had moderate arthritis in both hips, but more in his right hip. Simon knew that he would eventually need a hip replacement.

In July, Garvin ordered hip injections for Simon at UNMC's radiology department. Simon's primary care physician testified that Simon's hip pain could be treated with anti-inflammatory medication and hip injections that contained steroids and long-acting numbing medications. To guide the needle for an injection, orthopedic radiologists use a fluoroscopic-guided hip injection procedure. That is, they rely on x rays to determine the bone's location and whether they have successfully reached the joint, which is revealed by a color contrast in the injection.

Simon was warned of a risk of infection associated with the procedure and signed a consent form. The record shows that Simon is a large man. The radiology department used a 3½-inch needle to inject his hip joint. Simon described the July 2007 injection as a 10-minute procedure involving no pain and requiring only one attempt to inject his hip joint. He followed the radiology department's directions, and 3 days later, he received significant pain relief that lasted until March or April 2008.

In May 2008, Garvin ordered Simon's second hip injection at UNMC. Drake was UNMC's radiology residency director. Brad Hilger, a first-year resident physician at UNMC under Drake's supervision, performed the 2008 injections. Hilger read Simon the consent form and discussed the possible risks, including infection, which Hilger explained were usually low. Simon signed the consent.

Hilger used "CloraPrep," an antiseptic solution, to sterilize Simon's skin before attempting an injection. He did not sterilize Simon's skin again during the procedure. Before beginning, Hilger was concerned that the 2½-inch needle on the instrument tray might be too short and consulted Drake, who was watching from behind a partition screen. Hilger and Drake both testified that they normally use a 3½-inch needle. At trial, Drake admitted that she had never used a 2½-inch needle for a

hip injection. The assisting technician testified that a 2½-inch needle is sometimes referred to as a "pediatric needle." But after Drake walked around the partition and looked at Simon and the needle, she told Hilger that although the needle looked a little shorter than a 3½-inch needle, it would probably work and he should go ahead and use it.

Hilger made an unsuccessful attempt to inject Simon's hip joint with the 2½-inch needle, but he was unsure whether the needle was too short or whether he had missed the femur. Drake testified that from looking at the fluoroscopy machine, she thought that the needle had deflected off to the side of Simon's femur bone. She told Hilger to redirect and try again. On the second attempt, Hilger again failed to hit the bone. Drake determined that the needle had not hit the bone and removed it. She stated that they needed a longer needle and asked the technician to find a 5½-inch needle for her, but one was not available.

After a few minutes, the technician returned with a 7- or 7½-inch needle. By this time, Simon was nervous. He said that he would come back another day but that Drake told him to sit still and she would have the injection finished in a few minutes. On her second attempt with the 7-inch needle, Drake injected the medication into Simon's hip joint. The record shows a total of four needle penetrations: two with the 2½-inch needle and two with the 7-inch needle. Drake testified that she had not previously made more than two attempts to inject a hip joint. Hilger estimated that the procedure took 25 minutes from the time Simon was sterilized until Drake's successful injection.

After he left UNMC, Simon said that he felt overly sore but attributed it to the multiple injections. He followed Drake's directions, but the pain progressed through the weekend. Around 2:30 a.m. on the following Tuesday, Simon was in terrible pain. He was taken by ambulance to the hospital and treated for a staphylococcus aureus infection, which resulted in his admission to intensive care. Simon's primary care physician testified that the infection was life threatening. Simon underwent a debridement procedure to remove unhealthy

tissue and clean out the infection from his hip joint. When he returned home 5 days later, his infection seemed to be under control.

But the debridement procedure failed to remove all of the infection. In August, Garvin performed another debridement procedure to remove the necrotic (dead) cartilage, tissue, and bone in Simon's hip joint and femur. The infection had abscessed in his hip joint and destroyed it. Garvin had to remove Simon's femur head and replaced it with a "spacer," an artificial ball that delivers antibiotics to the joint and the femur. But the spacer was not structurally sound and rotated out of the socket easily. Simon was unable to walk and had significant pain. He required strong pain medication and nursing care until he could receive a hip replacement when the infection cleared up. In November 2008, Garvin performed a total hip replacement. Simon had extensive rehabilitation until October 2009.

### PROCEDURAL HISTORY REGARDING GARVIN'S TESTIMONY

In November 2009, Simon sued Drake, alleging that she was negligent in her treatment and in her failure to obtain his informed consent. Drake answered that Simon had consented to the procedure knowing that there was a risk of infection and that she had performed the procedure within the standard of care.

Before trial, Simon moved in limine to exclude Garvin's opinions in a deposition and at trial regarding the standard of care and causation. Simon argued that Garvin's opinions were irrelevant because he was Simon's treating physician and neither party had retained him as an expert. The court agreed. It had previously entered a progression order requiring the parties to identify their experts, and Drake had not identified Garvin as an expert. It ruled that Garvin's opinions about the standard of care and medical causation were therefore irrelevant and inadmissible. It stated that Drake's attorney could not ask Garvin for "any opinions that don't relate to the facts having to do with the treatment that he provided to [Simon]."

Before calling Garvin, Drake's attorney sought to clarify what questions he could ask Garvin. He conceded that he had not designated Garvin as an expert but stated that he would ask Garvin only whether multiple penetrations with a needle were "a complication." Simon's counsel protested that Garvin's proposed testimony would be an opinion regarding the standard of care and that Garvin was not a designated expert. Drake's counsel, however, assured the court that he would not ask Garvin about the standard of care or whether using a 2½-inch needle violated the standard of care. The court ruled that Drake's counsel could ask Garvin about multiple needle penetrations.

Garvin testified that he had occasionally performed hip injections. Drake's attorney then asked, "Is there a standard size needle that one uses?" Simon objected, but the court overruled Simon's continuing objection to that line of questioning. Garvin testified that the needles came in a range of sizes and that the proper length depended upon the patient's size: "I would say two-and-a-half to four-and-a-half would cover most. Occasionally you might use a large needle."

In a side bar, Simon objected that Drake's counsel had said he would not ask these questions about the standard needle size. The court agreed. But when Simon asked the court to instruct the jury to disregard Garvin's testimony about the needle size, the court stated, "I find it to be harmless error and I'm going to leave it the way it is."

Garvin further testified that infection is a recognized complication of hip injections and that based on his experience, it is not uncommon with arthritic hips to place the needle more than once to get it in the correct site. He said that he knew of no literature that correlated the length of the procedure or the number of penetrations with an increased risk of infection.

### Expert Testimony at Trial

Three medical experts testified for Simon. These experts generally opined that the procedures used by Hilger and Drake fell below the standard of care for using sterile techniques to prevent infection. Between them, they opined that Simon's risk of infection had been increased by the following actions:

(1) Drake's approving Hilger's use of the wrong size needle; (2) Hilger's and Drake's failing to use the standard size needle, which is a 3½-inch needle; (3) Hilger's and Drake's making multiple needle penetrations in a nonsterile environment instead of an operating room; (4) Hilger's handing the needle to Drake; and (5) Drake's failing to sterilize Simon's skin again before attempting the third and fourth injections.

Drake countered with one expert. He opined that Simon's skin would have remained sterile during the entire procedure and that four attempts at a hip injection did not violate the standard of care. He believed that Simon's previous hip injection could have caused scar tissue that made a successful injection more difficult. Finally, he stated that a 3½-inch needle is the standard size but that its use is not always required, depending on the patient's size. He believed Drake's decision to try the injection with a 2½-inch needle was within the standard of care. But on cross-examination, Drake's expert conceded that a 2½-inch needle is normally used with children or small adults, that Simon was not small, and that he would not have used a pediatric needle on Simon.

## Closing Argument

In his closing argument, Drake's attorney emphasized Garvin's testimony:

> One final witness that testified. And, again, I got kind of broken up, but we can't get into that. And I think this testimony is critical, and that's Dr. Kevin Garvin. Dr. Garvin is . . . Simon's doctor. He was . . . Simon's father's doctor. . . . I asked him this question: Doctor, is there any standard size needle? Dr. Garvin said, No, there's no standard size needle. . . . I said, Is there a standard time for the procedure? He said no. . . . And what he said was it can take as little as 10 to 15 minutes or it can take as long as 30 to 40 minutes. That was the testimony of [Simon's] own doctor. . . . And he went on to say that procedures can take longer with a patient who's had hip disease [like] Simon.
>
> He said infection is a recognized complication of the procedure. Every witness has testified to that. He said it's

not uncommon to have to place the needle more than one
time or multiple times. Not uncommon. And, remember,
we started out by asking Dr. Garvin, Do you do these pro-
cedures? Is this something that you do in your practice?
And he said, Yes, he does them. And we know that they're
done either by radiologists such as Dr. Drake or orthope-
dic surgeons. And he does these procedures, and he said
it's not uncommon to have to place needles more than one
time, or multiple times for that matter. And then he was
asked about if the risk of infection — I asked him, Does
the risk of infection increase with the passage of time and
with the number of sticks? And I wrote this down word
for word. "I don't know that to be true. There's no litera-
ture that says that." And that's Dr. Garvin.

The jury returned a unanimous verdict for Drake. The court
overruled Simon's motion for a new trial.

## Court of Appeals' Decision

Simon appealed to the Court of Appeals, which affirmed.
The Court of Appeals concluded that any error in the admission
of Garvin's testimony was harmless because Simon could not
establish prejudice:

[S]imilar evidence was established and testimony given
through the numerous experts who testified, on behalf of
both Simon and Dr. Drake, about various issues which
included the standard of care and the standard size of
the needles utilized in similar injection procedures. The
record is clear that this was a battle of the experts.
Simon's experts testified that Dr. Drake violated the stan-
dard of care in numerous ways, while Dr. Drake and her
expert testified that she did not violate the standard of
care. Each of the experts in this case gave substantially
similar and generally more specific testimony as given by
Dr. Garvin regarding what was the standard size of the
needle used in similar procedures. The weight to be given
to that expert testimony was a determination for the jury
to make as the fact finder. . . .

Thus, even though we find it was error for the dis-
trict court to allow the testimony, without a curative

instruction to the jury to disregard or strike the testimony, Simon has not established that the admission constituted reversible error. . . .

Simon argues that the district court erred by allowing Dr. Drake's counsel to again address the issue in closing arguments . . . . However, Simon did not object to this statement either during or immediately after closing arguments. . . . Thus, any error that occurred during closing argument by Dr. Drake's counsel was waived.

## ASSIGNMENTS OF ERROR

Simon assigns that the Court of Appeals erred as follows:

(1) failing to presume prejudice from the wrongful admission of Garvin's testimony;

(2) concluding that Garvin's testimony was cumulative or substantially similar to other testimony and therefore not prejudicial, when Garvin's testimony essentially served as an admission by Simon because of Garvin's unique status and credibility as Simon's treating physician;

(3) mischaracterizing the record by stating that the issues on appeal concerned a "'battle of the experts,'" because Garvin was not testifying as an expert when he gave the wrongfully admitted testimony regarding needle length; and

(4) concluding that Simon had waived his objections to Drake's violations of the order in limine by withholding objections during closing argument.

## STANDARD OF REVIEW

[1,2] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.[1] In a civil case, the admission or exclusion of evidence is not reversible error unless it unfairly prejudiced a substantial right of the complaining party.[2]

---

[1] *American Central City v. Joint Antelope Valley Auth.*, 281 Neb. 742, 807 N.W.2d 170 (2011), *cert. denied* ___ U.S. ___, 132 S. Ct. 525, 181 L. Ed. 2d 351.

[2] *Werner v. County of Platte*, 284 Neb. 899, 824 N.W.2d 38 (2012).

## ANALYSIS

The Court of Appeals did not explain why the trial court's admission of Garvin's testimony was error. We address that issue first because it is relevant to why we are reversing the Court of Appeals' decision with directions to vacate the district court's judgment and remand the cause for a new trial.

Neb. Evid. R. 702[3] governs the admissibility of expert testimony and provides that the witness must be qualified as an expert: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness *qualified as an expert* by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." (Emphasis supplied.)

[3-5] We review a trial court's decision to admit or exclude expert testimony under the appropriate standards for abuse of discretion.[4] But under rule 702, a trial court does not have discretion to permit a witness who has not been qualified as an expert to testify to issues that require an expert's opinion. And under Neb. Evid. R. 701,[5]

> [i]f the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

But Garvin did not limit his testimony to his perceptions of Simon. And in medical malpractice cases, expert testimony by a medical professional is normally required to establish causation and the standard of care under the circumstances.[6]

The record shows that the trial started on May 9, 2011. Previously, on May 2, the court determined that because

---

[3] Neb. Rev. Stat. § 27-702 (Reissue 2008).

[4] See *Gary's Implement v. Bridgeport Tractor Parts*, 281 Neb. 281, 799 N.W.2d 249 (2011).

[5] Neb. Rev. Stat. § 27-701 (Reissue 2008).

[6] See *Thone v. Regional West Med. Ctr.*, 275 Neb. 238, 745 N.W.2d 898 (2008).

Drake had not designated Garvin as an expert, Garvin could not testify on the standard of care or medical causation. And during the side bar at trial, Simon's counsel argued that he had never had an opportunity to depose Garvin about his expert opinions.

Yet, despite its previous ruling that Garvin could not testify to the standard of care and medical causation, the court permitted Garvin to testify, over objection, to the issues that required expert testimony. Garvin's testimony that the correct needle size can vary and that multiple injections are not uncommon was an opinion that Drake did not violate the standard of care in using a 2½-inch needle. His testimony that the medical literature failed to show a correlation between multiple needle penetrations and an increased risk of infection was an opinion that Drake's multiple injections had not increased Simon's risk of infection. So the court permitted Garvin to testify to standard of care issues that were obviously not focused on his observations of Simon.

Furthermore, the court's combined rulings permitted Garvin to testify as an expert while denying Simon any opportunity to discover facts relevant to Garvin's qualifications as an expert on hip injections or to discover the data that he had relied on for his opinion on the increased risk of infection.[7] We conclude that the trial court erred in permitting Garvin to testify about standard of care issues and in refusing to give a curative instruction to the jury.

Moreover, we disagree with the Court of Appeals that Garvin's testimony was substantially similar to the testimony of the parties' designated experts. Compared to the testimony of a hired expert, a juror was likely to give great weight to Garvin's opinion because he was Simon's treating physician and testifying as an expert against his own patient. And the court's rulings meant that Simon had no meaningful opportunity to challenge the presumptive validity and weight of Garvin's opinions.

The jurors' assumption of Simon's trust in his doctor is no small matter. Jurors know from their own experience

---

[7] See Neb. Ct. R. Disc. § 6-326(4).

that a treating physician carries the patient's endorsement of trust. This was amply illustrated by Drake's attorney's closing argument. And contrary to the Court of Appeals' opinion, Simon was not required to object to this argument to preserve a claim of prejudice resulting from the admission of Garvin's testimony.

Although the court refused to give a curative instruction because it concluded that the error was harmless, this statement was effectively an overruling of Simon's objections. And after the court admitted Garvin's testimony, Drake was entitled to argue its probative effect in closing. So Simon did not waive an objection to improper argument. Instead, the argument shows that the Court of Appeals erred in concluding that Garvin was just another expert in a battle of experts. Although the substance of Garvin's opinions was similar to that of Drake's expert, the weight of his opinions differed because Garvin, as Simons' treating physician, was cloaked in an aura of trust and respect.

We addressed a similar issue in *Barry v. Bohi*.[8] There, the plaintiff sued her physician for negligently failing to detect her breast cancer. During part of the time that the physician provided treatment to the plaintiff, he was qualified under the Nebraska Hospital-Medical Liability Act,[9] limiting his malpractice liability. The act required patients to submit claims against qualified providers to a medical review panel before filing suit. At that time, a claimant could not waive the review,[10] but a claimant could (and still can) select one of the experts on the panel.[11] The act also provides, then and now, that the panel's written report determining whether the standard of care was met shall be admissible in a subsequent suit.[12]

The panel found that the plaintiff's physician had met the standard of care under the circumstances. In the subsequent suit, the court received the report into evidence, so the jury

---

[8] *Barry v. Bohi*, 221 Neb. 651, 380 N.W.2d 249 (1986).

[9] See Neb. Rev. Stat. §§ 44-2801 to 44-2855 (Reissue 2010).

[10] See *Barry, supra* note 8.

[11] See § 44-2841.

[12] See § 44-2844(2).

would have reviewed the report during deliberations. It returned a verdict for the defendant physician.

On appeal, we concluded that the court improperly admitted the report for those treatment dates in which the physician was not qualified under the act. We rejected the defendant physician's argument that the error was not prejudicial because there was independent evidence to establish that he had met the requisite standard of care:

> He correctly argues that, generally, if properly admitted evidence exists to establish that which improperly admitted evidence also establishes, the error in receiving the inadmissible evidence is harmless and that harmless error does not form a basis for the reversal of a judgment. . . . Those general rules, however, rest on the premise that the nature of the cumulative evidence is such that no prejudice results from its improper admission into evidence. That cannot be said of a written opinion rendered by a panel convened pursuant to the act *and numbering among its members an expert selected by* [*the plaintiff*]. . . . Under such circumstances prejudice must be presumed to result.[13]

As in this case, the plaintiff's selection in *Barry* of an expert physician signified her trust in his opinion. In *Barry*, because of the plaintiff's confidence in the expert's opinion, the jury would have given significant weight to it. In this case, this effect was amplified when Garvin, testifying as an "expert" against Simon, was his own treating physician. And we cannot conclude that the weight the jury likely would have given to Garvin's opinions was not the tipping point when Drake's only expert conceded that he would not have used a 2½-inch needle to inject Simon. We conclude that *Barry* controls here and that prejudice is presumed.

## CONCLUSION

We conclude that the trial court erred in admitting Garvin's testimony regarding standard of care issues when he was not

---

[13] *Barry, supra* note 8, 221 Neb. at 656, 380 N.W.2d at 253 (emphasis supplied).

designated as an expert. We further conclude that the Court of Appeals erred in holding that this error was not prejudicial. Finding prejudicial error, we reverse the judgment of the Court of Appeals and remand this matter with directions that it vacate the district court's judgment and remand this cause to the district court for a new trial.

REVERSED AND REMANDED WITH DIRECTIONS.

STEPHAN, J., participating on briefs.

WRIGHT, MILLER-LERMAN, and CASSEL, JJ., not participating.

———————————

STATE OF NEBRASKA, APPELLEE, V.
DOAN Q. AU, APPELLANT.
___ N.W.2d ___

Filed May 3, 2013.    No. S-12-040.

1. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

2. **Statutes.** The interpretation of a statute presents a question of law.

3. **Investigative Stops: Motor Vehicles: Probable Cause.** A traffic violation, no matter how minor, creates probable cause to stop the driver of a vehicle.

4. **Police Officers and Sheriffs: Probable Cause.** Probable cause merely requires that the facts available to the officer would cause a reasonably cautious person to believe that the suspect has committed an offense; it does not demand any showing that this belief be correct or more likely true than false.

5. **Statutes.** Statutory language is to be given its plain and ordinary meaning.

6. ____. Absent a statutory indication to the contrary, words in a statute will be given their ordinary meaning.

7. **Words and Phrases.** "Practicable" generally means capable of being done, effected, or put into practice with the available means, i.e., feasible.

8. **Probable Cause: Words and Phrases.** Reasonable suspicion entails some minimal level of objective justification for detention, something more than an inchoate and unparticularized hunch, but less than the level of suspicion required for probable cause.

9. **Constitutional Law: Criminal Law: Police Officers and Sheriffs: Investigative Stops: Probable Cause.** Under the Fourth Amendment, a policeman who lacks probable cause but whose observations lead him reasonably to suspect that a particular person has committed, is committing, or is about to commit a crime,