STATE OF NEBRASKA, APPELLEE, V.
RYAN E. KOZISEK, APPELLANT.
___ N.W.2d ___

Filed March 24, 2015.    No. A-14-022.

1. **Criminal Law: Motions for New Trial: Appeal and Error.** In a criminal
   case, a motion for new trial is addressed to the discretion of the trial court, and
   unless an abuse of discretion is shown, the trial court's determination will not
   be disturbed.
2. **Trial: Evidence: Appeal and Error.** The admission of demonstrative evidence
   is within the discretion of the trial court, and a judgment will not be reversed on
   account of the admission or rejection of such evidence unless there has been a
   clear abuse of discretion.
3. **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial
   court's decision is based upon reasons that are untenable or unreasonable or if its
   action is clearly against justice or conscience, reason, and evidence.
4. **Trial: Testimony.** Testimony in the form of an opinion or inference otherwise
   admissible is not objectionable because it embraces an ultimate issue to be
   decided by the trier of fact.
5. **Trial: Testimony: Witnesses.** Opinion testimony by a lay witness is permit-
   ted only where it is rationally based on the perception of the witness and it is
   helpful to a clear understanding of his testimony or the determination of a fact
   in issue.
6. ____: ____: ____. Opinion testimony by a lay witness is generally admissible
   where it is necessary and advisable as an aid to the jury, but it should be excluded
   whenever the point is reached at which the trier of fact is being told that which it
   is itself entirely equipped to determine.
7. ____: ____: ____. A lay witness' function is to describe what he has observed,
   and the trier of fact will draw a conclusion from the facts observed and repro-
   duced by the witness.
8. **Criminal Law: Trial: Juries: Evidence: Appeal and Error.** In a jury trial of
   a criminal case, whether an error in admitting or excluding evidence reaches a
   constitutional dimension or not, an erroneous evidential ruling results in prejudice
   to a defendant unless the State demonstrates that the error was harmless beyond
   a reasonable doubt.
9. **Trial: Evidence: Verdicts: Juries: Appeal and Error.** Evidentiary error is harm-
   less when improper admission of evidence did not materially influence the jury
   to reach a verdict adverse to substantial rights of the defendant. Harmless error
   review looks to the basis on which the trier of fact actually rested its verdict; the
   inquiry is not whether in a trial that occurred without the error a guilty verdict
   would surely have been rendered, but, rather, whether the actual guilty verdict
   rendered in the questioned trial was surely unattributable to the error.
10. **Jurisdiction: Prosecuting Attorneys: Indictments and Informations.** A pros-
    ecutor is required to file an information listing the offense in the county with
    jurisdiction over that offense.

11. **Prosecuting Attorneys: Witnesses: Indictments and Informations.** A prosecutor must endorse the names of witnesses known to the prosecutor at the time the information is filed.

12. **Witnesses: Indictments and Informations.** The purpose of Neb. Rev. Stat. § 29-1602 (Reissue 2008) is to notify the defendant as to witnesses who may testify against the defendant and give the defendant an opportunity to investigate them.

13. **Rebuttal Evidence: Witnesses: Indictments and Informations.** The requirement of endorsement of the State's witnesses on the information has no application to rebuttal witnesses.

14. **Trial: Rebuttal Evidence.** Rebuttal evidence is confined to new matters first introduced by the opposing party and is not an opportunity to bolster, corroborate, reiterate, or repeat a case in chief.

15. ____: ____. Rebuttal evidence is limited to that which explains, disproves, or counteracts evidence introduced by the adverse party.

16. **Trial: Rebuttal Evidence: Appeal and Error.** The abuse of discretion standard is applied to an appellate court's review of a trial court's ruling on the admissibility of rebuttal testimony.

17. **Trial: Juries: Evidence.** Demonstrative exhibits are defined by the purpose for which they are offered at trial—to aid or assist the jury in understanding the evidence or issues in a case.

18. **Trial: Evidence: Testimony: Proof.** Demonstrative exhibits are admissible if they supplement the witness' spoken description of the transpired event, clarify some issue in the case, and are more probative than prejudicial.

19. ____: ____: ____: ____. Demonstrative exhibits are inadmissible when they do not illustrate or make clearer some issue in the case; that is, when they are irrelevant, or when the exhibit's character is such that its probative value is substantially outweighed by the danger of unfair prejudice.

20. **Trial: Evidence: Testimony.** Demonstrative exhibits are relevant only because of the assistance they give to the trier of fact in understanding other real, testimonial, and documentary evidence.

21. **Double Jeopardy: Evidence: New Trial: Appeal and Error.** The Double Jeopardy Clause does not forbid a retrial so long as the sum of all the evidence admitted by a trial court, whether erroneously or not, would have been sufficient to sustain a guilty verdict.

Appeal from the District Court for York County: ALAN G. GLESS, Judge, and J. PATRICK MULLEN, Judge, Retired. Reversed and remanded for a new trial.

Mark E. Rappl for appellant.

Jon Bruning, Attorney General, and Nathan A. Liss for appellee.

IRWIN, RIEDMANN, and BISHOP, Judges.

Riedmann, Judge.

## INTRODUCTION

Ryan E. Kozisek was convicted in the district court for York County of intentional child abuse resulting in death. He appeals, arguing that his motion for new trial should have been granted because of the erroneous admission of opinion testimony and improper rebuttal evidence. He also claims that the district court erred in overruling his objection to a demonstrative video. We agree that the district court abused its discretion in overruling the motion for new trial, because the admission of the opinion testimony constituted prejudicial error. We therefore reverse, and remand for a new trial.

## BACKGROUND

Kozisek was charged with intentional child abuse resulting in death following the death of his 4-month-old daughter, Kaley Kozisek (Kaley). Kozisek married Kassandra Roper (Kassandra) in 2008. Their first daughter was born in January 2009, and their second daughter, Kaley, was born in September 2010. Kozisek was disappointed when he and Kassandra found out their second child would be a girl, and he became "[m]ore stressed [and d]epressed" after Kaley was born. He did not understand why Kaley cried so much, and Kassandra recalled him saying that he "hated" Kaley. He also told a coworker that he "hated" Kaley and told another coworker that Kaley cried so much that he felt like "shaking [her] to the point where [she] would stop crying."

Kaley had "milk and soy protein intolerance [and] spit up a lot" during feedings. Kassandra described her as a "[f]ussy" eater, but otherwise, as generally healthy. Kaley contracted the stomach flu in early January 2011, however, so Kassandra called the pediatrician because Kaley was vomiting. Around that same time, Kassandra noticed an indentation on the back of Kaley's head and mentioned it to the pediatrician when Kaley was in her office on January 17. Kaley also saw her pediatrician on January 21 for her 4-month checkup. At that visit, she was bright-eyed, very alert, developing appropriately, and breathing comfortably. According to Kassandra, Kaley was also "fine" on January 22 and 23 and played with toys,

giggled, and smiled. Kaley was still fussy during feedings, but according to Kassandra, that was normal for her.

Kozisek quit his job in January 2011, forcing Kassandra to find employment while Kozisek stayed home with his daughters. On Kassandra's first day of work, January 24, she got up around 3 a.m., and before leaving for work, she checked on Kaley, who was sleeping "perfectly fine." When she called home around 10 a.m., Kozisek said Kaley was "breathing kind of funny" and put the telephone up to Kaley so Kassandra could hear her breathing. Kassandra thought Kaley sounded "a little bit different," but she was not too concerned and said she would look at Kaley when she got home around 1 p.m. At 12:18 p.m., Kozisek called the 911 emergency dispatch service and reported that Kaley was barely breathing, limp, and starting to turn blue.

When emergency medical services initially arrived, Kaley was unresponsive and did not have a pulse. She was initially taken to a hospital in York, Nebraska, and then shortly thereafter, she was "life-flighted" to a hospital in Omaha, Nebraska. Kaley died the following day.

At trial, the State called several expert witnesses who testified that Kaley's injuries were not caused accidentally. An ophthalmologist who examined Kaley at the hospital in Omaha observed extensive hemorrhaging in the back of her eyes. He opined that the cause of Kaley's injuries was nonaccidental trauma and could think of no other causes that would explain Kaley's retinal hemorrhaging.

A child abuse pediatrician also examined Kaley at the hospital in Omaha. She noticed that Kaley's eyes were fixed and widely dilated, which is an indication of severe brain injury. Because Kaley's eyes were so widely dilated, the child abuse pediatrician could look through the pupils and see the back of Kaley's eyes, where she "very clearly" observed blood. A CT scan showed evidence of severe brain injury. The back of Kaley's skull was depressed, an injury that is referred to as a "ping pong skull fracture" (ping pong fracture), because it looks like the indentation that occurs when "a ping pong ball [is] pushed in." Kaley also had bleeding between her brain and skull all around, including fresh blood, and severe swelling to

the brain. According to the child abuse pediatrician, it was not the blood or blood pressure in Kaley's brain that caused her to be ill, but her brain had been damaged by the same force that caused the bleeding. In the child abuse pediatrician's opinion, Kaley suffered from abusive head trauma and the injury occurred after the night of January 23, 2011.

Finally, the coroner's physician who performed the autopsy on Kaley on January 26, 2011, testified during the State's case in chief. He observed a cluster of bruises on the top of Kaley's head, as well as fresh blood, which is a manifestation of blunt force trauma. He also observed a subdural hemorrhage and subarachnoid hemorrhage, meaning she had bleeding in the connective tissues between the scalp and the brain. He further found bleeding around the optic nerves in both of her eyes extending into the retinas. The coroner's physician concluded that parts of the subdural hematoma were at least 3 days old; however, the subarachnoid hemorrhage, retinal hemorrhages, and bruising on the top of the head were no more than 1 day old. The coroner's physician opined that Kaley's cause of death was blunt force trauma to the head and brain.

Kassandra was called as a witness for the State. During her direct examination, the following exchange occurred:

Q Now during the interview with the state patrol . . . you continually denied that - - 100 percent that . . . Kozisek would have anything to do with the injuries to Kaley; is that correct?

A I remember saying that, yes.

Q Again, I don't know how many times that you denied it but it was numerous times?

A Correct.

Q And this was during your interview on the 24th of January, 2011?

A Correct.

Q Have you come to change your opinion?

[Defense counsel]: Your Honor, objection. Two reasons. One, it calls for an improper opinion. Two, it's an ultimate issue for the jury to decide.

THE COURT: Overruled.

Q . . . Have you changed your opinion on whether or not the injuries were caused by [Kozisek]?

A Yes, I have.

Q And why was it that you continued to say that he didn't - - or look - - reflecting back on the 24th?

A I was in shock. I honestly did not know what happened. I thought being with somebody for 10 years, how would they be able to hurt their own child. I never thought that he would do anything like that.

Kassandra said that she and her older daughter moved out of the family home in March 2011 and that she ultimately dissolved her marriage with Kozisek and moved to a different city.

Kozisek did not testify at trial, but his prior statements were introduced through several witnesses. He denied injuring Kaley and asserted that her death was caused by a series of tragic accidents, beginning with the ping pong fracture on the back of her head. He repeatedly claimed that while he was at home with his daughters on January 24, the older daughter fell or jumped off of a chair onto Kaley, which caused Kaley's breathing to change.

At trial, Dr. Janice Ophoven testified in Kozisek's defense. She is a medical doctor specializing in forensics and pediatric forensics. In Dr. Ophoven's opinion, there was insufficient evidence to conclude that Kaley's injuries and death were the result of abuse. Dr. Ophoven believed that the ping pong fracture put pressure on the veins in the back of Kaley's head, which increased intercranial pressure. Increased intercranial pressure is also associated with bleeding in the eyes. Dr. Ophoven believed that Kaley's vomiting and fussiness in the days leading up to her death were evidence of complications from increased intercranial pressure and that the older daughter's falling onto Kaley potentially caused a spike in pressure that shut down circulation to her brain and caused cardiac arrest.

Dr. Ophoven also testified that in the last 10 years, there has been a shift in the literature and science involving what is known as shaken baby syndrome. She claimed that it has been discovered that no matter how hard or how long you shake a

baby, the amount of force that can be generated is insufficient to cause the brain injury and retinal hemorrhaging that is so commonly seen in abused children. As a result, according to Dr. Ophoven, "the scientific basis for the original theory has now become controversial."

After the conclusion of Dr. Ophoven's testimony, the State indicated its intention to call a rebuttal witness. Kozisek objected, but his objection was overruled. The State then called Dr. Daniel Davis, a forensic pathologist and deputy medical examiner in Oregon, to testify on rebuttal. Dr. Davis testified that he disagreed with Dr. Ophoven's opinion. He believed that the ping pong fracture was unrelated to Kaley's death and that her vomiting was associated with her continued feeding issues. If the fracture were crimping the central vein in the back of Kaley's head as Dr. Ophoven claimed, Dr. Davis said he would expect to see symptoms immediately after the fracture occurred, but the fracture was nearly healed.

Dr. Davis testified that what is present in this case are the classic signs of a shaken baby. First, he disagreed with the notion that Kaley experienced cardiac arrest, and instead, he asserted that because she was unresponsive and not breathing but her heart was still beating, she was in respiratory arrest, which occurs as a result of interference with the brainstem. In addition, when a baby is shaken, the brain rotates inside of the head, which causes the veins on both sides of the central vein to tear and bleed over the surface of the brain and into the subdural space, which is exactly what was seen in Kaley. Moreover, what is seen in virtually all shaken baby cases is significant hemorrhage into the eyes, as was seen in Kaley's eyes.

Dr. Davis explained that when a baby is shaken, the brain is "basically stirred," and as a result, millions of nerve fibers throughout the brain are torn at a microscopic level. That causes the signals in the brainstem controlling alertness, breathing, and heart rate to be lost, which causes sudden unresponsiveness, changes to breathing for a few minutes, and then the cessation of breathing. He said that "it happens identically every time" because the effect on the brainstem is so profound in shaking due to shearing at the microscopic level.

To help illustrate Dr. Davis' explanation of the effects of shaking a baby, the State played a demonstrative video that Dr. Davis helped create approximately 10 years ago. Kozisek objected to the video, but his objections were overruled. Dr. Davis said that he was very heavily involved in the production of the video because he was the source of the accuracy of the medical information contained in it. He said that he has used the video about a dozen previous times in court and that it has also been used by other medical professionals in a variety of courtrooms throughout the country. The video is a graphic animation of the injuries that occur in a baby's brainstem when the baby is shaken. Dr. Davis described the video as "a demonstrative aid to help [him] explain the mechanism of injury in shaking."

Dr. Davis testified that the difference between his opinion on intercranial pressure and Dr. Ophoven's was "cause and effect." He believes that the increase in Kaley's intercranial pressure was an effect of the injuries she sustained, but Dr. Ophoven believed the pressure increase caused Kaley's injuries. According to Dr. Davis, shaking a baby injures the brain, and the brain's major reaction to injury is swelling. When the brain swells, intercranial pressure increases. Dr. Davis stated that Dr. Ophoven's opinion that increased pressure somehow caused everything else to happen was "backwards." He also stated that he could not "buy in" to the theory that the older daughter's falling on Kaley, which he noted was not even a substantiated fact, caused Kaley's death.

Dr. Davis was also asked to respond to Dr. Ophoven's claim that shaken baby syndrome is now a controversial diagnosis. He explained that "rather than just calling everything shaken baby," the suggestion now, when it is unclear whether there was also trauma, is to call it "abusive head trauma," which encompasses shaking, shaking with impact, and impact. The goal of this new position by physicians was not to detract from shaking as a mechanism of abusive head trauma but to broaden the terminology to account for the multitude of injuries that result from abusive head trauma. Thus, physicians are using the term "abusive head trauma" instead of "shaken baby" because

it is more inclusive of all of the mechanisms that can happen to children.

After the conclusion of evidence and deliberation, the jury found Kozisek guilty of intentional child abuse resulting in death. Kozisek filed a motion for new trial challenging Kassandra's opinion testimony, the State's rebuttal expert, and use of the demonstrative video. The district court found that the jury could infer Kassandra's opinion of Kozisek's guilt from her testimony and allowing this testimony was error. However, because there was abundant evidence adduced by the State to show Kozisek's guilt, the court found the error harmless. It also found no error in admitting the State's rebuttal expert or the demonstrative video. Accordingly, the district court denied Kozisek's motion for new trial. Kozisek was sentenced to 35 to 50 years' incarceration. He has now appealed to this court.

## ASSIGNMENTS OF ERROR

Kozisek assigns that the district court erred in (1) denying his motion for new trial after concluding that the admission of Kassandra's opinion testimony was improper but harmless error, (2) denying his motion for new trial because the State's rebuttal evidence did not respond to new matters introduced by him, and (3) overruling his objection to the demonstrative video.

## STANDARD OF REVIEW

[1] In a criminal case, a motion for new trial is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed. *State v. Ramirez*, 287 Neb. 356, 842 N.W.2d 694 (2014).

[2] The admission of demonstrative evidence is within the discretion of the trial court, and a judgment will not be reversed on account of the admission or rejection of such evidence unless there has been a clear abuse of discretion. *State v. Gutierrez*, 272 Neb. 995, 726 N.W.2d 542 (2007), *abrogated on other grounds, State v. Thorpe*, 280 Neb. 11, 783 N.W.2d 749 (2010).

[3] An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *State v. Ramirez, supra*.

## ANALYSIS

*Opinion Testimony.*

Kozisek asserts that the district court erred in denying his motion for new trial after concluding that Kassandra's opinion testimony was improper but harmless error. He claims allowing Kassandra to infer her opinion of Kozisek's guilt was not only erroneous, but materially influenced the jury's decision.

The district court concluded that although Kassandra did not specifically give her opinion, the implication that she now believes Kozisek caused Kaley's injuries is clear from her testimony. Kozisek asserts that allowing Kassandra to state her opinion of his guilt was error. We agree.

[4-7] Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact. Neb. Rev. Stat. § 27-704 (Reissue 2008). Opinion testimony by a lay witness is permitted only where it is rationally based on the perception of the witness and it is helpful to a clear understanding of his testimony or the determination of a fact in issue. See Neb. Rev. Stat. § 27-701 (Reissue 2008). It is generally admissible where it is necessary and advisable as an aid to the jury, but it should be excluded whenever the point is reached at which the trier of fact is being told that which it is itself entirely equipped to determine. *State v. William*, 231 Neb. 84, 435 N.W.2d 174 (1989). A lay witness' function is to describe what he has observed, and the trier of fact will draw a conclusion from the facts observed and reproduced by the witness. See *id*.

In the present case, Kassandra's testimony was not objectionable for the reason that it embraced the ultimate issue in the case, that is, Kozisek's guilt. However, her opinion failed to meet the § 27-704 requirement that it be "otherwise admissible" because it lacked sufficient foundation to show that her testimony was rationally based on her perception. The only

information elicited from Kassandra was that she initially did not think Kozisek had anything to do with Kaley's injuries, but that she has since changed her opinion. We do not know, however, the basis for her change in opinion. This leaves the record in doubt as to whether her belief of Kozisek's guilt is an expression of her actual knowledge or merely an expression of her opinion, which is impermissible. See *State v. Jacob*, 242 Neb. 176, 494 N.W.2d 109 (1993). Moreover, Kassandra's opinion would not be helpful to the fact finder because she was merely drawing a conclusion based on the same evidence that was being presented to the jury. We therefore agree with the district court that allowing Kassandra to testify that she has changed her opinion regarding Kozisek's guilt was error.

[8,9] Having concluded that the district court erred in allowing Kassandra's testimony as to her opinion of Kozisek's guilt, we must now determine whether such error was harmless. In a jury trial of a criminal case, whether an error in admitting or excluding evidence reaches a constitutional dimension or not, an erroneous evidential ruling results in prejudice to a defendant unless the State demonstrates that the error was harmless beyond a reasonable doubt. *State v. Cox*, 231 Neb. 495, 437 N.W.2d 134 (1989). Evidentiary error is harmless when improper admission of evidence did not materially influence the jury to reach a verdict adverse to substantial rights of the defendant. *State v. Freemont*, 284 Neb. 179, 817 N.W.2d 277 (2012). Harmless error review looks to the basis on which the trier of fact actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error. *Id.*

Here, the implication from Kassandra's testimony that she changed her opinion is that she now, at a minimum, questions whether Kozisek had something to do with Kaley's injuries or, worse, now believes that he intentionally caused them. Who better than Kozisek's then-wife and mother of his children would know whether Kozisek was capable of the crime with which he was charged? Given the spousal relationship

between Kassandra and Kozisek, we cannot say that the verdict rendered against Kozisek was surely unattributable to her testimony. Although Kassandra was not an expert, the weight of her opinion differed because of her relationship with Kozisek. See *Simon v. Drake*, 285 Neb. 784, 829 N.W.2d 686 (2013).

In *Simon v. Drake*, the Nebraska Supreme Court recognized the differing weight a witness' testimony may have depending upon his relationship with the party against whom he is testifying. In *Simon v. Drake*, a medical malpractice action, the defendant was allowed to elicit testimony from one of the plaintiff's treating physicians that the needle size used by the defendant was within the range of the proper needle size for the procedure at issue. He had not been designated as an expert. The trial court found this to be harmless error, and on appeal, we agreed. Upon further review, the Nebraska Supreme Court reversed. It reasoned that the treating physician's testimony was not substantially similar to the testimony of the parties' designated experts because "[c]ompared to the testimony of a hired expert, a juror was likely to give great weight to [the treating physician's] opinion because he was [the plaintiff's] treating physician and testifying as an expert against his own patient." *Id*. at 794, 829 N.W.2d at 693. The court went on to explain that the relationship between a patient and a treating physician was one of confidence and trust and that therefore, the jury would have given significant weight to that testimony. The court stated that it could not conclude that the weight the jury likely would have given to the treating physician's opinions was not the "tipping point" for finding in favor of the defendant, especially since the defendant's only expert conceded he would have used a different needle size. *Id*. at 796, 829 N.W.2d at 694.

Here, we determine that the jury would have given significant weight to Kassandra's testimony, given the spousal relationship between her and Kozisek. And we cannot conclude that the weight given to this testimony was not the "tipping point" for finding against Kozisek, especially when the medical evidence was conflicting and complex. See *id*. We therefore conclude that the State failed to prove beyond a reasonable

doubt that the admission of Kassandra's opinion of Kozisek's involvement in Kaley's death was harmless error. Accordingly, we reverse the conviction.

*Rebuttal Evidence.*

Although the foregoing determination resolves this appeal, we nonetheless consider the remaining assignment of error, because it presents issues which are likely to reoccur in the new trial we must order, as further explained below.

Kozisek argues that the district court erred in denying his motion for new trial because the State's rebuttal evidence was improper. He asserts that it was unfair for the State to call an unendorsed rebuttal expert and that doing so denied him an opportunity to depose and effectively confront the witness. Kozisek also claims that the State's rebuttal expert did not respond to new matters introduced by his expert; rather, the State used its rebuttal expert to improperly bolster and reiterate its case in chief. We disagree.

[10-12] Neb. Rev. Stat. § 29-1602 (Reissue 2008) requires a prosecutor to file an information listing the offense in the county with jurisdiction over that offense. The prosecutor must also endorse the names of witnesses known to the prosecutor at the time of the filing. See *id*. The purpose of § 29-1602 is to notify the defendant as to witnesses who may testify against the defendant and give the defendant an opportunity to investigate them. *State v. Molina*, 271 Neb. 488, 713 N.W.2d 412 (2006).

[13] But it has long been the rule in this state that the requirement of endorsement of the State's witnesses on the information has no application to rebuttal witnesses. *Id*. See, also, *State v. Canbaz*, 259 Neb. 583, 611 N.W.2d 395 (2000); *State v. Pratt*, 197 Neb. 382, 249 N.W.2d 495 (1977); *Griffith v. State*, 157 Neb. 448, 59 N.W.2d 701 (1953). Thus, the State was not required to provide Kozisek with Dr. Davis' name prior to trial.

[14-16] Kozisek also claims that Dr. Davis' testimony did not respond to new matters raised by Dr. Ophoven. Rebuttal evidence is confined to new matters first introduced by the opposing party and is not an opportunity to bolster, corroborate,

reiterate, or repeat a case in chief. *State v. Sandoval*, 280 Neb. 309, 788 N.W.2d 172 (2010). It is limited to that which explains, disproves, or counteracts evidence introduced by the adverse party. *Id*. The abuse of discretion standard is applied to an appellate court's review of a trial court's ruling on the admissibility of rebuttal testimony. *Id*.

An argument similar to Kozisek's was proffered and rejected by the Nebraska Supreme Court in *State v. Swillie*, 218 Neb. 551, 357 N.W.2d 212 (1984). There, the defendant contended that the rebuttal testimony should have been presented in the State's case in chief because it only corroborated the State's other witnesses. The Supreme Court iterated its prior holding that in a criminal prosecution, any testimony, otherwise competent, which tends to dispute the testimony offered on behalf of the accused as to a material fact is proper rebuttal testimony. See *id*. Thus, the court concluded that because the testimony tended to dispute testimony offered on behalf of the defendant as to a material fact, it was properly offered in rebuttal. *Id*.

Similarly, in the present case, Dr. Davis disputed Dr. Ophoven's testimony as to a number of material facts, including Kaley's cause of death and whether shaken baby syndrome is now a controversial diagnosis. Further, Dr. Ophoven claimed that the cause of death in cases such as this should be determined by a forensic pathologist, and Dr. Davis was the only one of the State's expert witnesses who was a forensic pathologist. Accordingly, we cannot find that the district court abused its discretion in allowing Dr. Davis to testify as a rebuttal witness. Therefore, Kozisek's motion for new trial was properly denied.

*Demonstrative Video*.

Finally, Kozisek argues that the district court erred in overruling his objection to the demonstrative video played during Dr. Davis' testimony. We find no merit to this argument.

[17-20] Demonstrative exhibits are defined by the purpose for which they are offered at trial—to aid or assist the jury in understanding the evidence or issues in a case.

*State v. Pangborn*, 286 Neb. 363, 836 N.W.2d 790 (2013). Demonstrative exhibits are admissible if they supplement the witness' spoken description of the transpired event, clarify some issue in the case, and are more probative than prejudicial. *Id*. Conversely, they are inadmissible when they do not illustrate or make clearer some issue in the case; that is, when they are irrelevant, or when the exhibit's character is such that its probative value is substantially outweighed by the danger of unfair prejudice. *Id*. They are relevant only because of the assistance they give to the trier of fact in understanding other real, testimonial, and documentary evidence. *Id*.

In the present case, the video was used to assist Dr. Davis in explaining what happens when a baby is shaken. Dr. Davis disagreed with Dr. Ophoven's theory that the ping pong fracture was crimping the central vein in Kaley's head and that the older daughter's falling on Kaley threw off her equilibrium and caused her to suffer cardiac arrest. First, Dr. Davis opined that Kaley suffered respiratory arrest, not cardiac arrest, because although she was unresponsive and not breathing, her heart was still beating. He believed that this occurred as a result of interference with her brainstem from abusive head trauma. He explained that shaking a baby causes the brain to move around in the head which results in the tearing of nerve fibers at a microscopic level. The signals in the brainstem that control alertness, breathing, and heart rate are lost, which is why the child suddenly becomes unresponsive and stops breathing. The video visually depicted the above-described testimony and assisted with Dr. Davis' explanation of his opinion on Kaley's cause of death and why he disagreed with Dr. Ophoven.

With respect to creation of the video, Dr. Davis testified that for the last 15 or more years, he has operated a company that makes graphics and demonstrative animation aids to help people understand difficult medical concepts. He commissioned the video to be made approximately 10 years prior and was heavily involved in its creation as the source of the accuracy of the medical evidence contained in it. It was repeatedly made clear to the jury during Dr. Davis' testimony that the

animation in the video was not intended to represent Kaley, but, rather, the video simply depicted what generally happens in a baby's brain when it is shaken.

Based on the foregoing, we find no abuse of discretion in the district court's conclusion that the video could assist the jury in understanding Dr. Davis' testimony and clarifying an issue in the case. This assignment of error is without merit.

*Double Jeopardy.*

[21] Having found reversible error in the admission of Kassandra's opinion testimony, we must determine whether the totality of the evidence admitted by the district court was sufficient to sustain Kozisek's conviction. If it was not, then the concepts of double jeopardy would not allow a remand for a new trial. See *State v. Borst*, 281 Neb. 217, 795 N.W.2d 262 (2011). The Double Jeopardy Clause does not forbid a retrial so long as the sum of all the evidence admitted by a trial court, whether erroneously or not, would have been sufficient to sustain a guilty verdict. *State v. Borst, supra*.

After reviewing the record, we conclude that the evidence presented at trial, including the evidence that should have been excluded, was sufficient to support Kozisek's conviction. As such, we conclude that double jeopardy does not preclude a remand for a new trial on the charge of intentional child abuse resulting in death. We therefore remand the cause to the district court for a new trial.

## CONCLUSION

We conclude that the district court erred when it denied Kozisek's motion for new trial because the admission of Kassandra's opinion regarding Kozisek's involvement in Kaley's death was prejudicial error. We reverse the decision of the district court and remand the cause to the district court for a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.